SANDS, Receiver, *v.* KIMBARK *et al.*, Executors.

Chapter 412 of 1862, providing for the settlement by a reference of contro-
versies between the receiver of an insolvent mutual insurance company
and its members or stockholders, is constitutional.

Such controversies respecting the adjustment and administration of a *quasi*
trust fund, in which a multitude of persons are concerned as contribu-
tors and distributees, have, by the customary law of ·this State, antece-
dent to the constitutional provision for preserving trial by jury, been
regarded as of equitable and summary cognizance, and are not among
the cases in which the trial by jury has been heretofore used so as to be
fastened among rights to remain inviolate.

To authorize an assessment, and a reference to enforce the same, there must
be evidence of losses sustained by the company other than a mere state-
ment thereof in an affidavit of the receiver — such as proof of judgments
recovered against the corporation; the presentment and allowance of
claims; or other evidence which would conclude the corporation if it
continued in business.

APPEAL from the Supreme Court. This was a proceeding
under the act of April 21, 1862, entitled "An act to facilitate
the closing up of insolvent and dissolved mutual insurance
companies," to recover the amount of a premium note made
by David Kimbark, which had been assessed for losses to its
full amount. The receiver, upon notice, procured the appoint-
ment of a referee, for the purpose and in the manner provided
in the statute. The referee heard the proofs and allegations
of the parties upon written pleadings, the defendants objecting
in due time and manner, that the act under which the referee
was appointed, was unconstitutional. This objection was
overruled and the defendants excepted. The referee found
certain facts and conclusions of law, among the latter, that the
act under which the reference and trial were had, was constitu-
tional, and to this the defendants excepted. There were some
other exceptions, which are sufficiently noticed in the opinions.
The referee filed his report and a judgment was entered upon
it, in the Supreme Court, which, upon appeal by the defend-

ants to the court at general term, was affirmed, and thereupon the defendants appealed to this court.

*Horace Packer* and *Ward Hunt*, for the appellants.

*Henry R. Mygatt*, for the respondent.

MARVIN, J. The defendants claim that they were entitled to a trial by jury, and that the order of reference and the trial were in conflict with the Constitution, in which it is declared that "the trial by jury, in all cases in which it has been heretofore used, shall remain inviolate forever." (Art. 1, § 2.) The act of 1862 (Sess. Laws, 743), authorized the reference and trial. Is it in conflict with the Constitution?

The Constitution of 1777 contained the like provision, thus: "That trial by jury, in all cases in which it has heretofore been used in the Colony of New York, shall be established and remain inviolate forever." (§ 41.) The provision in our present Constution is copied from the Constitution of 1821 (art. 7, § 2).

The corporation represented by the plaintiff as receiver, was insolvent, and the defendants' testator was a member of such corporation. In equity, the stock and other property of a private corporation are deemed a trust-fund for the payment of its debts, and the creditors have a lien upon it, or a right of priority of payment, in preference to its stockholders; and courts of equity, prior to our Constitution, entertained jurisdiction in such cases and enforced the trust. (2 Story Eq., § 1252.) The trust is implied, and arises from what are called equitable liens, being liens which exist in equity, and of which courts of equity alone take cognizance. (2 Story Eq., § 1215.) Upon the dissolution of such corporation, the creditors may pursue the property and enforce their claims, unless it has passed into the hands of *bona fide* purchasers; for the property is deemed to be held in trust, first, for the payment of the debts of the corporation; and second, for the benefit of the stockholders, in proportion to their respective interests. (Tiff. & Bull., Law of Trusts and Trustees, 110; 8 Pet., 286.)

The property owned by an insolvent partnership is deemed, in equity, a trust fund, to be first applied in the payment of partnership debts, and if any remains, then to the partners, in proportion to their interests. Though the creditors of the firm have no lien, as such, upon the partnership property, they have a right in equity to follow it, as a trust, into the possession of all persons, who have not a superior title (2 Story Eq., § 1253; *Buchan* v. *Sumner*, 2 Barb. Ch., 197). The enforcement of trusts is a copious source of the jurisdiction of courts of equity, and when the property of any debtor is vested in a trustee or trustees, a court of equity has jurisdiction to compel the execution of the trust.

As, under our Revised Statutes, in relation to attachments against absconding, concealed and non-resident debtors, and assignments made under the statutes in relation to insolvents, the property of the debtor and the insolvent became vested in trustees for the benefit of creditors, I have always supposed that the provisions which those statutes contain (2 R. S., p. 45, § 19 *et seq.*) for settling controversies arising between the trustees and other persons in the settlement of any demands against the debtor, or of debts due to his estate, by a reference to three disinterested persons, to be agreed upon, and in case such other person would not agree or consent, then to be appointed in the manner specified, upon the application of the trustees, with power to hear and determine the controversy, and concluding the rights of the parties, originated in the principles of equity to which I have referred, and that they were not obnoxious to the objection that they were in conflict with the provisions of the Constitution of 1821, touching the right of trial by jury. They were taken substantially from the Revised Laws of 1813, v. 1, p. 166, and will be found also, in substance, in an act passed in April, 1786, entitled "an act for relief, against absconding and absent debtors." (1 Green., Statutes, 221, § 16.) The property of the absconding debtor being seized and transferred to trustees for the benefit of creditors, and the property of insolvents, being transferred, either voluntarily or coercively, for the like purpose, it became a trust pro-

perty or a trust fund for the payment of debts over which a court of equity had jurisdiction; and the legislature provided a cheap and expeditious mode of realizing the fund and settling controversies in relation to it, without action, either at law or in equity.

I confess I should find more difficulty in sustaining the provisions in question, in the Revised Statutes, than those in the act of 1862, now under consideration. The former embraced controversies between the trustees and persons who were mere creditors or debtors of the insolvent, or absconding debtor, whereas the act of 1862, so far as it affects the present case, may be confined to those persons who were members of the insolvent corporation. And the object of the action by the receiver, who is the trustee for the creditors, is to collect a debt due from such stockholder. The case is clearly one in which the creditors have an equitable lien, and from which an implied trust, in their behalf, arises; and the legislature could provide for the manner of enforcing the trust, without a resort to an action at law or in equity, without infringing the provision of the Constitution, relating to trial by jury. I think, upon the question we are considering, the decision in *The matter of the Empire City Bank* (18 N. Y., 199–211), is in point. That case arose under the act of 1849, to enforce the responsibilities of stockholders in certain banking corporations, and a referee was appointed to ascertain and report such liabilities. The stockholder was deprived of a trial by jury

Another objection is made to the constitutionality of the act of 1862, viz.: that it created a new tribunal or court, not authorized by the sixth article of the Constitution. It is an error, I think, to regard the referee as a court. The proceedings were instituted before the Supreme Court, by a notice, in pursuance of the statute, and the referee was appointed by the court or a justice thereof; and by the statute a judgment of the court was to be, and has been, entered upon his report, which, upon appeal from the judgment to the general term, could be set aside. The proceeding, under the statute, is in

the Supreme Court, and the judgment is a judgment of the court. The judgment should be affirmed.

DENIO, Ch. J. The judgment appealed from was rendered upon the report of a referee appointed on the application of the plaintiff and without the assent of the defendants, pursuant to the act entitled " An act to facilitate the closing up of insolvent and dissolved mutual insurance companies," passed April 21, 1862. (Sess. Laws, p. 743.) The defendants insist that the mode of trial contemplated by that act, and which was adopted in this case, was a violation of the constitutional provision declaring that " the trial by jury, in all cases in which it has been heretofore used, shall remain inviolate forever." (Art. 1, § 2.) Actions upon contracts for the payment of money were generally cognizable in the courts of common law, before the jurisdiction of law and equity was blended; and the trial of questions of fact arising in such actions was by jury, except in some special cases where, from peculiar circumstances, referees were allowed to take the place of a jury. An action on a promissory note must generally be tried by jury, if any issue of fact be joined in such action; and this was so whether the holder of the note was the original payee or had acquired his right to it by transfer, or by operation of law. But long before the adoption of the Constitution a practice had grown up of winding up and settling the affairs of insolvent estates and insolvent corporations, and of estates in the hands of trustees, by suits in equity ; and another practice had, under legislative authority, prevailed to a considerable extent, of settling such estates by subjecting the demands in favor of or against them to adjudication by referees appointed by mutual consent, or if such consent could not be obtained, by an appointment of such referees on the application of one of the parties to a court or judge. For instance: the trustees of the estates of insolvent debtors, under any of the forms of insolvency regulated by statute, might apply to the officer who appointed them, or to any officer having a like authority, to appoint referees to adjudicate upon any controversy between

them, and any person who had a claim against the estate, or any person against whom they, as trustees, made a claim, and the referees were to possess the same powers as referees appointed in personal actions. (2 R. S., pp. 44, 45, §§ 19 to 25.) The estates of insolvent corporations were settled and the liabilities of the stockholders were enforced by summary proceedings, without a jury trial, as was explained in *The matter of the Empire Bank* (18 N. Y., 199.) In this class of cases, causes of action to which a jury trial was appropriate, and which, if unconnected with an insolvent estate, could not be constitutionally enforced in any other way, were subject to a summary mode of adjudication. The motive for this departure from the course of the common law doubtless was, the avoiding of a multiplicity of regular actions, and the policy of a speedy adjustment of transactions in which a large number of persons were interested. The present case does not fall within any of the particular provisions of this kind which had been enacted and were in existence before the formation of the Constitution. But the Constitution does not refer to particular cases, but to classes of cases. I am of opinion that statutes of the same general character and based upon the same motives of policy with those which have been mentioned, may be passed without a violation of the constitutional provision. In the case under consideration, there was a class of corporations which had or might become insolvent, of which there were many creditors, and many persons, namely, the premium note makers, occupying a position bearing some analogy to ordinary debtors, and a strong analogy to stockholders. They were liable to pay a proportion, or the whole amount of their deposit notes as the state of the indebtedness, and of the other assets, might require.

Existing laws had, prior to the act which is now challenged, and prior to the Constitution, authorized the appointment of a receiver of insolvent corporations, to take the assets into his hands, and enforce the liabilities of the parties bound to contribute. I am of opinion that the statute in question is in *pari materia* with those which have been mentioned; that it

was founded upon the same motives of policy, and was designed to produce a similar result, namely, a speedy and inexpensive liquidation of the affairs of the insolvent insurance company. Hence, it was a *case* in which the trial by jury had not been invariably in use before the adoption of the Constitution, and such a mode of trial was not, therefore, guaranteed by its provisions.

But I am of opinion that the plaintiff should have been required to give some evidence of the existence of losses, which rendered an assessment proper. The point was expressly taken by the defendants' counsel, "that there was no legal proof of the occurrence of any losses for which any assessment could be made, nor for which the said note was liable to contribute." The note is conceded not to have been given as a contribution to capital, like the notes required upon the formation of a mutual insurance company; but it is agreed that it was virtually an undertaking to pay a just proportion of all the losses which should occur during the time the maker remained an insured party, and a just proportion of the expenses. The act of 1852 (ch. 71) authorizes a receiver, under the sanction of the court, to make assessments, but does not declare their effect. The directors, while their duties continue, and the receiver, when he has, for some purposes, taken their place, are naturally cognizant of the demands which exist against the institution. They have in their hands all the deposit notes. It was the duty of the directors, and it is the duty of the receiver, under the act of 1852, to make an assessment, that is, a statement of the amount which each of the makers ought to pay towards the satisfaction of the debts. But neither of them, I think, have the power, by this *ex parte* proceeding, to determine the amount of the debts and liabilities existing against the corporation. It would be, to say the least, very unusual for the legislature to make a provision, that a conditional contract, such as these premium notes are, could be established to be absolute as to the whole or part of the amount conditionally agreed to be paid, by a proceeding to which the person contracting was not a party, nor

entitled to be heard. In this case the only evidence of losses was the *ex parte* affidavit of the receiver, which was not competent evidence of the matter stated against the makers of the notes. I do not say that, upon the trial of an action on such a note, the plaintiff would be bound to show the existence of the several fires by which the several insured parties had sustained losses. Evidence which would have concluded the company while it was engaged in its proper business, or notice of a loss and its settlement and allowance, or a judgment recovered against the company would have been sufficient. But a mere list, made out by the receiver, though supported by his *ex parte* affidavit, is clearly insufficient. The 10th section of the Jefferson County Act, which was the pattern of many mutual companies, explains my idea of what was necessary to be proved. "The directors," it is there said, "after receiving notice of any loss or damage by fire, &c., and ascertaining the same, or after the rendition of any judgment, &c., against the company for loss or damage," are to "settle and determine the sums to be paid by the several members thereof as their respective proportion of such loss," &c. This is what is meant by an assessment. (Laws 1836, ch. 61.)

The foregoing is substantially the view taken of the act of 1852 by the Supreme Court and by this court. (*Thomas* v. *Whalen*, 31 Barb., 172; *Bangs* v. *Duckenfield*, 18 N. Y., 592); and but for the circumstance I am about to state, I should think the judgment ought to be reversed upon this point. But it has been pointed out, on consultation, that a *settled Case* in a suit of the present plaintiffs against one Smith Shoemaker was produced on the trial, and that there is an agreement contained in the Case in the present action, that such former case should be made a part of the present one. That former case has not been printed or produced to us, and as it may contain the evidence which has been supposed to be wanting, I agree that the exception which assumes that there was no proof of losses cannot be sustained.

The judgment must, therefore, be affirmed.

All the judges concurring,          Judgment affirmed.