M. COCKRILL ET AL. V. PARMELIA J. COX ET AL.

(*In Re* Estate of Rhoda Byler, dec'd –Case No. 2135)

1. PROBATE OF WILL—CONTESTATION OVER—DISTRICT COURTS—TRIAL BY JURY—A party to a contestation arising upon an application for probate of a will, begun in the county court, but subsequently transferred to the district court, because of the disqualification of the judge of the county court, is entitled, on request, in the district court, to a trial by jury.

2. WITNESS—EVIDENCE—It is competent for a witness to give his opinion as to one's mental capacity to make a will, after having testified to the facts upon which that opinion is predicated. (Citing Garrison *v.* Blanton, 48 Tex. 301.)

3. OMISSION IN CHARGE—NOT A SUBJECT OF REVIEW, UNLESS—SPECIAL INSTRUCTIONS—An omission on the part of the trial court to charge the jury on a particular phase of the case, will not be considered by the appellate court, unless the complaining party, by asking a special instruction on the point, shows that he has not speculated on the chances of a favorable verdict. (Citing Beazley *v.* Denson, 40 Tex. 434.)

4. WILLS—TESTAMENTARY CAPACITY—EVIDENCE—VERDICT OF JURY—See the opinion, on motion for rehearing in this case, for evidence held sufficient to support the verdict of a jury against the testamentary capacity of a testatrix at the time of making her will.

APPEAL from Fayette. Tried below before the Hon. H. Teichmueller.

On June 19, 1884, S. B. Moore and M. Cockrill filed, in the county court of Fayette county, their petition for the probate of the last will

and testament of Rhoda Byler, deceased, and for letters testamentary. The petition, after stating jurisdictional facts, alleged that the decedent left a large estate, real and personal, of the probable value of $35,-000, and also a last will, in which petitioners were named executors, and prayed that the will be admitted to probate, and that letters testamentary be granted the petitioners. On July 5, 1884, Parmelia J. Cox, Martha Tutwiler, joined by her husband H. A. Tutwiler, and Elizabeth Hess, joined by her husband F. A. Hess, filed their protest against the probating of the will, for the reasons:

1. That, as the heirs of Rhoda Byler, deceased, they were interested in her estate.

2. That the alleged will offered for probate was not the last will and testament of Rhoda Byler, deceased, because it had not been subscribed by her and two attesting witnesses; and, because, at the time of executing the alleged will, the deceased was not of sound and disposing mind, and did not execute it, knowing or intending the disposition she was thereby making of her property.

On February 6, 1885, the county court made an order in the cause, transferring it to the district court of Fayette county, because of the disqualification of the county judge. On June 5, 1885, the cause was tried in the district court, before a jury on the demand of the contestants, and against the protest of the propounders, the court submitting to the jury, under the evidence and its charge, the following special issues:

1. Did Rhoda Byler sign the instrument in writing in question, intending it as her will, either herself, or by some other person, by her directions and in her presence?

2. Was the instrument of writing, purporting to be the will of Rhoda Byler, attested by two credible witnesses, above the age of fourteen years, subscribing their names thereto in the presence of the testatrix?

3. Was Rhoda Byler, at the time of the execution of the instrument in question, of sound mind?

The jury answered each of these issues in the negative; whereupon, the court adjudged that the instrument offered for probate was not executed in manner and form required by law to make it the will of Rhoda Byler; that she was of unsound mind at the time of its attempted execution; that the same was not the will of Rhoda Byler: that it be rejected and not admitted to probate; that propounders pay all costs, and that a copy of the judgment be certified to the county court of Fayette county for observance. From this judgment, propounders appealed.

On the trial, G. W. Tuttle, a witness, who had known Mrs. Byler, the deceased, and had had business transactions with her for a series of years, having at great length described her mental condition for several years prior to her death, and having related all of her little peculiarities, was permitted, over the objection of propounders, to state his opinion as to her mental capacity to make a will at the time she executed the one offered for probate. This was assigned as error.

The third special charge asked by the propounders, and refused by the court, the refusal of which was assigned as error, was as follows :

"As to the question of testamentary capacity, you are charged that a person whose mind is affected by old age and disease, so as to be enfeebled, and whose memory may be impaired, yet, if there is a capacity to understand and design the act, to understand the nature and character and amount of her property, to know the objects of her bounty, and to understand the provisions and intend them, then such a person is sufficiently sound of mind for the purpose of making and executing a will."

That portion of the court's charge relating to the same issue was as follows:

"Was Rhoda Byler, at the time of the execution of the instrument in question, of sound mind? The soundness of the mind, or testamentary capacity, requisite to make a valid will, is such that the testator, when making a will, is capable of knowing and understanding the nature of the business he is engaged in, and the elements of which the will is composed, and the disposition of his property he means to dispose of by his will, and the persons to whom he means to convey it, and the manner in which it is to be distributed among them."

The facts are sufficiently set forth in the opinion on the motion for rehearing.

*Ellis & Patton, Moore, Duncan & Meerscheidt,* and *Phelps & Lane,* for appellants, on the alleged error of the court in granting contestants a trial by jury, cited: R. S., art. 1803, chap. 3, title 37, p. 269; Bradley *v.* Love, 60 Tex. 476.

On other questions discussed in the opinion, they cited: 1 Redfield on Wills, p. 148, sec. 12, and note 33; R. S. 4859; Garrison *v.* Blanton, 48 Tex. 300–304; R. S. 1316, 1317; 1 Redfield on Wills, p. 205, sec. 18; Id. p. 228, note 58; Fowler *v.* Stagner, 55 Tex. 400; 1 Redfield on Wills, 4th ed., p. 100, secs. 10, 11 and note 12; 1 Redfield on Wills, 4th ed., p. 129, sec. 14; 1 Redfield on Wills, 4th ed., pp. 131, 132, secs. 17, 18, 19; Pidcock *v.* Pot-

ter, 8 Am. Reps. 182–195; Moore v. Moore, Redfield Am. Cases 182; Coudrey v. Coudrey, Redfield Am Cases, 192 ; Duffield v. Morris, Redfield Am. Cases 210; Potts v. House, Redfield Am. Cases 262.

*Robson & Rosenthenthal* and *Brown & Dunn*, for appellees, on the right of trial by jury, cited: R. S., 1139, 1121, 2208; Munson v. Newsom, 9 Tex. 113; Moore v. Hardison, 10 Tex. 471, 472; Constitution of Tex., art. 1, sec. 15; Ib., art. 5, sec. 10; Ib., latter part of sec. 16; Davis v. Davis, 34 Tex. 15 ; Linney v. Pelouquin, 35 Tex. 29 ; Denson v. Beazley, 34 Tex. 191; Beazley v. Denson, 40 Tex. 416.

That it is competent for a witness to give his opinion as to one's mental capacity to make a will, based on the facts which enter into the formation of that opinion, they cited: Redfield on Wills, 4th ed., 137, 138, 139, 140, 141, 142; Reynolds v. Dechaumes, 24 Tex. 174; Renn v. Samos, 33 Tex. 766; Thomas v. State, 40 Tex. 64; Garrison v. Blanton, 48 Tex. 301.

On other questions discussed in the opinion, they cited: Redfield on Wills, 95, 102; Garrison v. Blanton, 48 Tex. 321, 302 ; Ford v. McBryde, 45 Tex. 499 ; Metzger v. Wendler, 35 Tex. 367; Powell v. Haley, 28 Tex. 52; Peeler v. Guilkey, 27 Tex. 355; Davis v. Roosvelt, 53 Tex. 305; G., H. & S. A. Ry. v. Delahunty, 53 Tex. 207; Berry v. Donley, 26 Tex. 736; 1 Redfield on Wills, 4th ed., 225, notes 47, 49; Redfield's Am. Cases 59–64; Stevens v. Van Cleve, 4 Wash. Ct. Rep. 662; Wood v. Chambers, 20 Tex. 247 ; Jones v. State, 13 Tex. 168; Howerton v. Holt, 23 Tex. 60; Blankenship v. Douglas, 26 Tex. 228 ; Gray v. Burk, 19 Tex. 232 ; Powell v. Messner, 18 Tex. 405 ; Duffel v. Noble, 14 Tex. 665; Redfield on Wills, 4th ed. 224; Fowler v. Stagner, 55 Tex. 400; Oliver v. Chapman, 15 Tex. 406; Redfield Am. Cases, 246, 247, 621, 631, 632, 633, 753; Jordan et als. v. Brophy, 41 Tex. 283; Bailey v. White, 13 Tex. 118; Gilliard v. Chesney, 13 Tex. 337; McFarland v. Hall, 17 Tex. 690.

ROBERTSON, ASSOCIATE JUSTICE. — All the constitutions of the Republic and State of Texas have preserved the right of trial by jury, in the same language.   Const. of Republic, 9th clause of Declaration of Rights ; Const. of 1845, sec. 12, art. 1; Const. of 1866, sec. 12, art. 1; Const. of 1869, sec. 12, art. 1; Const. of 1876, sec. 15, art. 1. In the Constitution of 1845, the provision that this right should "remain inviolate," was deemed a sufficient security of it in all cases in the district court, except causes in equity, for which a special clause was introduced.   Sec. 8, art. 4.

The act of 1848 gave us our first complete system of probate juris-

prudence, and, under it, the initial proceeding to probate a will was in the county court, which, as then organized, had no power to impanel a jury. Pas. Dig., art. 1261. A contest could be had in the county court, and either party could annul the result by an appeal to the district court (P. D. 1267, 1384), or a contest could be originally inaugurated in the district court, and the contest there, whether the jurisdiction was acquired by an original proceeding or by appeal, by the uniform practice, without the authorization of an express statute or other constitutional provision than those adverted to, was tried by a jury, unless the intervention of a jury was expressly waived. Parker v. Parker, 10 Tex. 85; Crain v. Crain, 21 Tex. 790; Vickory v. Hobbs, 21 Tex. 571; Tynan v. Paschal, 27 Tex. 287.

The constitution of 1869 ordained that the right of trial by jury should "remain inviolate" (sec. 12, art. 1); that, in all cases of *law or equity*, involving more than $10.00, the right should be preserved (sec. 16, art. 5); and that, "in the trial of all causes in the district court, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury * * * * * " By this constitution exclusive original jurisdiction of probate matters was conferred upon the district court (sec. 7, art. 5), and, to adapt the procedure to the organic changes, the probate law of 1870 was enacted. In this law it was stated, that "there is no trial by jury in matters of probate, except when expressly provided by law." P. D., art. 5481.

In the case of Davis v. Davis, 34 Tex. 1, construing the law and the constitution, it was held that a contest over the probate of a will, without expressly considering whether it was a case of law or equity, or the parties to it could be called plaintiff or defendant, must be tried by jury, if demanded. This construction was accepted and acted upon until the law was repealed, and the constitution of 1869 was superseded by that of 1870. Renn v. Samos, 33 Tex. 763; Denson v. Beazley, 34 Tex. 191; Gardner v. Spivy, 35 Tex. 509; Linny v. Pelonquin, 35 Tex. 36; Beazly v. Denson, 40 Tex. 416; Johnson v. Brown, 51 Tex. 65.

As far as the history of the practice is preserved in reported cases, the right of trial by jury, in such contests as this, has been recognized and exercised under all the constitutions and laws that, at different times, have prescribed the jurisdiction and regulated the procedure of our courts. In such cases, in other states, by statute or the usage of courts, directly, or upon feigned issues, at some stage of the proceed-

ing, a jury is allowed to pass upon the facts. Acts of Leg. of Col. 1867, 1868; Benoist v. Murrin, 58 Mo. 318; Williams v. Robinson, 42 Vt. 658; Boyd v. Boyd, 66 Pa. St. 292; McGinnis v. Kempsey, 27 Mich. 363; Boardman v. Woodman, 47 N. H. 120; Glancy v. Glancy, 17 Ohio St. 134; Howland v. Taylor, 53 N. Y. 627.

A provision preserving the right of trial by jury, expressed in substantially the same language, it is said, is to be found in all the state constitutions, and it has been uniformly construed to perpetuate the right in the cases in which it exists, under the laws in force and practice prevailing at the date of the adoption of the particular constitution. Cooley on Const. Lim. 506. Thus, when the constitution of Michigan was adopted, a party in possession of land was entitled to a jury trial of a suit against him, involving the title. It was held that the legislature could not deprive him of this right by authorizing his adversary to proceed against him by bill to remove cloud. Tabor v. Cook, 15 Mich. 322.

In Indiana, at the date of her constitution, a party was entitled to have a jury assess the damages in condemnation proceedings, and this right was held to be inviolable. Ry Co. v. Heath, 9 Ind. 558; Dane Co. v. Dunning, 20 Wis. 221; 41 N. H. 550 ; Sands v. Kunbark, 27 N. Y. 147 ; County v. Morrison, 22 Minn. 178.

Pennsylvania is only, apparently, an exception; for, whilst the right is determined under the peculiar phraseology of her constitution by the *status quo* of 1776, yet, the power of the legislature to confer and cut off the right, in certain cases exercised under the earlier constitutions, was considered as approved, in not being expressly denied in the constitution of 1838. Byers v. Commonwealth, 42 Pa. St. 93.

The provision in the constitution of 1876, that the right of trial by jury shall remain inviolate, must be considered as perpetuating the right in the cases, in which, at the date of its adoption, it had been so universally recognized and firmly established, as in the contests arising over the proof of wills.

Construing the statute (R. S. 1803), in the light of the interpretation of substantially the same language, in the case of Davis v. Davis, 34 Tex. 1, and of the principle that it should be held void only to the extent of the conflict with the higher law, we can see no constitutional objection to the refusal of a jury in the contest in the county court. The right of jury trial remains inviolate, though denied in the court of first instance (in civil cases), if the right to appeal and the jury trial on appeal are secured. Cooley on Const. Lim. 507.

It is said, however, that in this case the district court sits purely

as a court of probate. There is no appeal from the district court trying the contest in the first instance, to the district court as the final trial court in probate matters. It results that in such cases the preliminary trial in the county court is dispensed with, and the final trial provided for on appeal in other cases, is had originally, when the case comes originally to the district court. The law to be applied to the case is the same in the county and district courts. Bradley v. Love, 60 Tex. 476. But, what the case is, to which to apply the law, is determined by each by the means and methods peculiar to itself. When a case is appealed from the justice's to the county court, the jury is charged and a trial is had in accordance with the practice of the county court. If the county judge is disqualified in the case, and it is transferred to the district court, it is tried before a jury of twelve and not six men, and the practice of the district court prevails. In Texas, "the memory of man runneth not to the contrary" of this procedure in courts to which a cause is taken for trial *de novo*.

We think the appellee's demand for a jury in the court below was properly granted. There was no error in allowing the witness, Tuttle, to state his opinion of Mrs. Byler's capacity to make a will, after he had testified to the facts upon which the opinion was predicated. Garrison v. Blanton, 48 Tex. 301.

Was the will signed, attested and intended, were the three issues submitted to the jury in the court below, upon each of which the finding was against the appellant. It was conceded, in argument, that upon the last issue, involving the testamentary capacity of Mrs. Byler, there was a conflict of testimony sufficient to protect the verdict under the well settled rules of this court. It is also obvious that if this issue was fairly submitted to the jury, and the finding upon it is sustained, any error committed by the court or jury upon the other issues, could not affect the result, unless the finding on the other issues is so clearly wrong as to indicate that the appellants have not had a fair trial upon the whole case.

There was no error in the refusal of the third special charge requested by appellant, as the substance of it was embraced in the court's definition of testamentary capacity.

To the charge, as given, it is objected that the court did not instruct the jury that less capacity would suffice to make a valid will than would be required in making contracts, and that, in determining Mrs. Byler's capacity, the jury should look to her acts in the preparation of the will, and the condition of her mind at the time of its preparation, as well as at the moment of final execution. Without now passing upon propriety of such instructions, it must be a sufficient

answer to the objection, that no special charges upon these points were requested.     The error, if it was error, was one of omission, and not of commission, and cannot be considered by this court, unless the party complaining, by asking a special instruction, shows that he is not speculating on the chances of a favorable verdict.     Beazley v. Denson, 40 Tex. 434.

We find no error in the charge of the court in submitting to the jury the controlling issue.

Nor, can we justly conclude that the jury, in determining the other issues against the appellants, manifested passion or prejudice, or other motive or influence, inconsistent with a fair and deliberate consideration of the case submitted to them.     To have a valid manual execution and a valid attestation of the will, under the charge of the court, Mrs. Byler must have possessed the faculty of consciousness and the capacity to understand that she was signing a will and having it attested.     To this extent, the same question as in the third issue was involved, and upon it, there is the same conflict of evidence.

We find nothing in the record to justify us in disturbing the judgment, and it must, therefore, be affirmed.

AFFIRMED.

[Opinion delivered February 2, 1886.]

---

ON MOTION FOR RE-HEARING.

ROBERTSON, ASSOCIATE JUSTICE.—Mrs. Rhoda Byler, at the date of her death, on June 12, 1884, was in the seventy-eighth year of her age. Her fatal illness commenced on May 23, 1884, and, from that time on, she lay almost constantly in a dense stupor.   When aroused, she did not return to the contemplation of the affairs that had engaged her interest and attention for the past half century, but, incoherently and wanderingly, she complained of her pains, until she subsided again into apathy.   She manifested, throughout, many of the symptoms of chronic softening of the brain.   Her attending physician ascribed her condition and death to other causes, but other physicians, to whom, hypothetically, her case was stated, pronounced her disease to be softening of the brain.   Two or three years before, she had been attended, in two spells of sickness, by Dr. Renfro, and his opinion was, that she was then suffering with chronic softening of the brain. In another spell, in the summer of 1883, features of the same disease were developed.   Experts, on a fair presentation of her case, as dis-

closed by the contestants' evidence, were of opinion that she died of softening of the brain, and that this malady had been growing upon her for several years prior to her death.

About the time that Dr. Renfro declares that he discovered that she was afflicted with this disease, a change was noticed in her habits and character, in a degree, and in particulars, not to be accounted for, except upon the theory of a serious affection of the brain. She had been a devoted mother—she became an indifferent one. She had been steady in her purposes, and became weak and vacillating. She had possessed a strong and vigorous understanding, independent and self-reliant—she became timorous and distrustful of herself, and formed and acted upon opinions based solely upon fanciful premises. She had been remarkably cleanly and neat about her person and household, and ceased to be.

A grand daughter, who spent a few months with her, and made herself useful about the old lady's home, was charged for her board. A shawl she had presented to her daughter she reclaimed under circumstances amounting to an accusation of theft, and, without a ground of suspicion, or the instigation of special malice, under a delusion without rational basis, she accused the same daughter of stealing $5.00. She secreted about her premises her own provisions, and accused a faithful, old house-servant, who had been with her for sixteen years, of the larceny. She miscalled the names of those with whose names she was familiar. She was irritable and suspicious, and, in these unhappy years, could discover no honesty in man or woman. She would send for family supplies, and countermand the order, and still receive them; and forget, whilst a messenger was executing an errand, that she had ever authorized it. Though her bank account in an entire year would exhibit but comparatively few items of credit or debit, her bankers found such difficulty in having her remember and comprehend them, as to induce them to seek monthly settlements with her. What she understood at one moment, had to be re-explained in the next. When she aroused her household at night, and scribbled upon one of her several drafts of a will, she did not recognize her marks the next morning, or remember what had transpired. She miscalled the names of her own children, and spoke of two of her nieces as her sisters. She would slip food from her own table, and charge the old servant with the theft of it.

The will propounded for probate was signed on May 23, 1884, the day of the commencement of her last illness, and after she was stricken with it. The night before, at twelve m., she had aroused her old servant by calling for the servant's son, who had been gone to

Mexico since the February before. She then called for the old servant's daughter, who was not there, and had not been in the service of Mrs. Byler for several years. Mrs. Byler, then, after dismissing a daughter of the servant waked up on the supposition that she was the one wanted, fell asleep.

Early in the afternoon of the next day she was taken sick, suffered with a violent pain in the right arm, and again encountered in articulation the difficulties Dr. Renfro had noticed in 1881 or 1882, and Dr. Tutwiler in 1883, and which, with the partial paralysis of the right side, were strongly symptomatic of softening of the brain. She instructed her servant to send for Mr. Sam Moore, but the servant, instead, sent for Mrs. Gilmore, upon whose arrival, Mrs. Byler wished, with her help, to execute the will then enclosed in an envelope. She succeeded, after repeated efforts, in making the servant understand that she wished the paper to be produced, and then indicated to Mrs. Gilmore her desire that the envelope should be opened. She seems to have forgotten that she had ordered Mr. Moore to be sent for, and was willing to have the assistance of Mrs. Gilmore. Mrs. Gilmore, when the sick woman's wish was interpreted, declined to break the seal of the envelope, and Mr. Moore was then sent for. When William, instead of Sam Moore, responded to the summons, she recognized him and inquired about his brother; and her wish to sign and have her will witnessed, he finally understood. But his inquiry of Mrs. Gilmore and of the old servant, whether the old lady wished any change in or addition to the paper, could only have arisen from a doubt in his own mind about her capacity to fully explain her wishes, and as to the correctness of his understanding of her purpose. When he returned with Mr. Wheeler, her articulation was indistinct and she could not make herself understood. One pair of spectacles was substituted, not upon her suggestion, for another, not obtained at her instance, and her hand, without her request, was guided, whilst her name, mispelled, was subscribed. The witnesses put their names to the paper without her formal request, and the instrument, propounded as her will, passed from her custody with her assent, but not upon her suggestion. She may have been consciously consummating a cherished desire and intelligently executing a last will, but she was passive and prompted. She was in the final grasp of a fatal disease, and, if she comprehended the meaning of the paper she was substituting for the law pertaining to the distribution of her estate, she knew that she was sowing the seeds of discord among her own progeny.

The paper she was executing was the third edition of her testa-

ment in less than a year. In all of them she named as one of her executors authorized to act alone if his associate failed to qualify, without bond, independent of the probate court, with powers which staked her estate upon his discretion and integrity, a man she had consistently regarded and bitterly denounced as dishonest, through a series of years. In February, before her death, she executed the second edition of her will, differing from the first, among others, in two noteworthy particulars. She increased from three to five thousand dollars a bequest to a grand daughter, recently married, and authorized her executors to lend the moneys of her estate, not required to be immediately paid out, to safe bankers, at low rates of interest, and expressly relieved them from responsibility for any interest not actually received by them. The two executors were just then forming a partnership in the banking business, and, whilst she was putting in the hands of either of them the absolute disposal of her estate, she was loudly lamenting that one of them, her nephew, in forming this business partnership, was exposing his substance to the cupidity and dishonesty of the other. And, in this same month of February, whilst increasing the patrimony of the newly married grand daughter, she denounced the new husband, and declared that no one bearing his name should benefit by her will.

The third and last edition was a copy of the second.

We have now stated the strong points in the contestants' case. Some of the facts related are not denied—the most of them are strongly contradicted. The whole theory is vigorously and cogently combatted, and, by an array of witnesses and a mass of evidence, the sanity of Mrs. Byler is stoutly defended. A verdict supporting the will may have been more satisfactory to this court, but that rendered appears to be the deliberate judgment of a jury, selected and accepted by the parties, according to prescribed rules, and complained of as unfitting arbiters of the facts, only when their award has disappointed expectation. The court below refused a new trial, and we find in appellants' favor no such preponderance of evidence as would justify the conclusion that the judgment to be revised is not the result of a fair and impartial trial.

In the motion for rehearing, the counsel for appellants, inform the court that it was not their purpose to concede, in the oral presentation of the case, that there was a substantial conflict in the evidence as to the testamentary capacity of Mrs. Byler. The court understood that concession to be made, and acted, in the original disposition of the case, upon that understanding, and did not give to the facts the careful consideration they would otherwise have received. The statement

of facts, which is well expressed, and is void of useless matter and repetitions, and occupies one hundred and seventy-five pages of the transcript, has now been carefully considered, with the result already announced.   The motion for rehearing is refused.

MOTION OVERRULED.

[Opinion delivered March 16, 1886.]